1
2
3   E-FILED on 3/27/2013
4
5
6
7
8
9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11   RAUL UVALLES,                    )   No. C 09-5221 RMW (PR)
                                      )
12                Plaintiff,          )   ORDER GRANTING
                                      )   DEFENDANTS' MOTION FOR
13       v.                           )   SUMMARY JUDGMENT
                                      )
14   FRANCISCO JAQUEZ, et al.,        )
                                      )
15                Defendants.         )
                                      )
16   _____)

17       Plaintiff, a California prisoner proceeding pro se, filed an amended civil rights complaint,

18   pursuant to 42 U.S.C. § 1983 against prison officials at Pelican Bay State Prison ("PBSP").

19   Upon initial screening, the court found that plaintiff had alleged cognizable claims for relief that

20   defendants violated his right to be free from cruel and unusual punishment, violated his right to

21   bodily privacy, violated the Equal Protection Clause, and were deliberately indifferent to his

22   serious medical needs.  The court ordered service upon named defendants.[1]

23       On February 28, 2012, defendants filed a motion for summary judgment and request for

24   judicial notice.[2]  On May 3, 2012, plaintiff filed a motion in opposition to defendants' motion for

25

26       [1]  In his amended complaint, plaintiff also alleged that he was deprived of basic human
     needs such as outdoor exercise and proper hygiene.  However, in the court's order dated June 29,
27   2011, the court concluded that the claim was unexhausted and dismissed it.

28       [2]  Defendants' request for judicial notice is GRANTED.

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Uvalles221msj.wpd

summary judgment, which the court construed as a motion to continue under Federal Rule of

Civil Procedure 56(d).  So construed, on September 17, 2012, the court provisionally granted

plaintiff's motion to allow him to submit a supplemental declaration to satisfy his burden under

Rule 56(d), see Family Home and Finance Center, Inc. v. Federal Home Loan Mortgage, Corp.,

525 F.3d 822, 827 (9th Cir. 2008), or, alternatively, to file an opposition.  Thereafter, plaintiff

requested, and was granted, two additional extensions of time within which to comply with the

court's order.  Plaintiff has not filed a timely supplemental declaration or opposition to

defendants' motion for summary judgment.

Defendants' motion is now ripe for consideration.  For the reasons stated below,

defendants' motion for summary judgment is GRANTED.

**BACKGROUND**[3]

In June 2008, plaintiff was placed in PBSP's Behavioral Management Unit ("BMU").

(Am. Compl. at ¶ 1.)  Plaintiff remained there through October 23, 2008 on lockdown. (Id.)  On

September 7, 2008, on the Facility B yard, members of the Northern Structure prison gang

attempted to murder Correctional Officer Kingstrom by stabbing him in the face. (Decl.

Barneburg at ¶ 8.)  After the attack, prison officials launched an investigation to identify other

individuals involved with the Northern Structure prison gang. (Id.)  At that time, prison officials

believed any person identified as being involved with that gang was a potential threat to prison

security and correctional staff, especially if they were housed in Facility B. (Id.)  Although

plaintiff was not housed in the same block where the assault occurred, all blocks and sections

that housed "Classified Northern Hispanics" were barstrapped, i.e., an additional padlock was

placed on the outside of their cell doors. (Am. Compl. at ¶ 3.)

Around October 18, 2008, a validated Northern Structure gang member defecated a paper

bundle ("kite") upon which contained names of other inmates at PBSP. (Decl. Barneburg at ¶ 9.)

It is common for inmates to hide contraband such as this by ingesting or placing it in their

rectum to avoid detection. (Id.)  This practice is also often used by gangs to conceal weapons or

---

[3] The following facts are undisputed unless otherwise indicated.

1   communications concerning attacks.  (Id.)  The kite was entitled "overall man power roster," and

2   was gang communication.  (Id.)  Typically, the Northern Structure used these types of kites to

3   identify newly arrived inmates in good standing with the gang prior to their arrival in the prison,

4   and identified those inmates who are willing to function directly under the authority of the

5   Northern Structure.  (Id.)  Plaintiff's name was on the roster identifying him as someone willing

6   to participate in Northern Structure prison gang activity.  (Id.)  In light of the recent attack on

7   Officer Kingstrom, prison officials believed that plaintiff, who was housed on Facility B and

8   identified as being willing to perform on behalf of the Northern Structure prison gang, might

9   possess a weapon or communication in his rectum, and thus, presented a threat to the prison

10  staff.  (Id.)

11          On October 23, 2008, plaintiff was ordered removed from lockdown and placed in

12  Contraband Surveillance Watch ("CSW") by Investigative Services Unit J. Hernandez, R.

13  Drown, M. Cleary, and Sgt. John Doe.  (Am. Compl. at ¶ 6; Decl Maiorino, Ex. A at OAG-110.)

14  Plaintiff believes that he was placed into CSW because he was a "Northern Hispanic" and prison

15  officials were retaliating against all "Northern Hispanics" for the September 7, 2008 staff

16  assault.  (Am. Compl. at ¶ 9.)

17          CSW is intended to prevent an inmate from accessing or destroying contraband he has

18  ingested.  (Decl. Graves at ¶¶ 6, 9; Exs. A, B.)  It entails searching the inmate and his clothing

19  for contraband, and then placing him in an empty cell under continuous observation by staff for a

20  sufficient amount of time to allow him to pass any ingested contraband via bowel movements.

21  (Decl. Graves, Ex. A.)  Ordinarily, the inmate will be kept on CSW for the time it takes to

22  produce three bowel movements, but the time-period may be extended for 24 more hours if

23  necessary.  (Id.)  While on CSW, the inmate is dressed in boxer shorts and a t-shirt, the clothing

24  around his abdomen and around his boxer shorts are taped so that the inmate cannot access his

25  body cavities, and he is placed in mechanical leg and waist restraints with attached handcuffs.

26  (Id., Ex. A at OAG-001.)  The toilet is turned off and a bucket is provided so that the inmate's

27  bowel movements and urine can be searched for contraband.  (Id.)  The inmate is medically

28  assessed before being placed on CSW and while on it, is assessed daily, the inmate gets a blanket

1    if the temperature falls below 65 degrees, and the cell is kept clean.  (Id.)  Plastic tubes are

2    placed over the inmate's hands and wrists to prevent him from using his fingers to remove items

3    from his rectum, and the tubes are removed during meals and bowel movements, for which staff

4    is present.  (Id. at ¶¶ 9-10, Ex. B.)  Prior to the introduction of these tubes in 2008, inmates on

5    CSW had a history of avoiding contraband capture by removing items from their anus and

6    destroying or re-ingesting them.  (Id. at ¶ 9.)  Statistics collected by prison officials have shown

7    that the use of the tubes greatly increased the rate at which contraband was captured.  (Id. at ¶¶

8    11-15, Ex. C.)

9        On October 23, 2008, plaintiff was medically cleared for CSW placement.  (Am. Compl.,

10   Ex. D at 2; Decl. Maiorino, Ex. A at OAG-084.)  Plaintiff arrived at CSW at 3:40 p.m.  (Am.

11   Compl., Ex. D at 2.)  Plaintiff was allowed one pair of socks, one t-shirt and two pairs of boxer

12   shorts.  (Am. Compl. at ¶ 12.)  Plaintiff was placed in leg irons, waist chains, cuffs, and "the

13   tube," which fits over the hand and is secured by the waist chain.  (Id.)  Only part of his hand

14   was exposed.  (Id.)  The CSW is a 4 x 6 cell with continuous overhead lighting and ventilation.

15   (Id. at ¶ 13.)  Plaintiff was only able to sit down and stand up.  (Id.)  Plaintiff was assigned a

16   correctional officer who was on duty to record plaintiff's actions every fifteen minutes.  (Id. at ¶

17   15.)

18       At one point, plaintiff needed to defecate, and was escorted to a plastic chair which had

19   an open bottom with a plastic bag taped to the bottom of seat.  (Id. at ¶¶ 15-17.)  Although "the

20   tube" was removed from plaintiff's hands, at no time was plaintiff allowed out of the cuffs.  (Id.

21   at ¶ 18.)  Sgt. Henderson, a female officer, stood in front of plaintiff the entire time plaintiff was

22   trying to defecate, and she tore off sections of toilet paper for plaintiff to use when he finished.

23   (Id. at ¶¶ 19-21.)  Plaintiff was given sanitary wipes to clean his hands, but not allowed to wash

24   them.  (Id. at ¶¶ 23, 25.)  Plaintiff was embarrassed to defecate, and be exposed, in front of Sgt.

25   Henderson.  (Id. at ¶¶ 23-24.)  Thereafter, all restraints were placed back on plaintiff.  (Id. at ¶

26   25.)

27       Throughout the CSW, plaintiff alleges that he was not permitted to wash his hands (id. at

28   ¶¶ 27, 29, 33) and he was given only a bare mattress without linens at night (id. at ¶ 30).  By the

1   fourth day, plaintiff had completed a total of five bowel movements, none of which revealed any

2   contraband. (Decl. Maiorini, Ex. A at OAG-084.) Plaintiff was released on October 27, 2008 at

3   12:30 p.m. (Id.)

4      Over the four days that plaintiff was on CSW, temperature logs show that the temperature

5   averaged 71 or 72 degrees. (Decl. Maiorino, Ex. A at OAG-084.) Prison officials observed

6   Plaintiff throughout his CSW placement and checked on him regularly. (Am. Compl., Ex. D.)

7   He was provided a mattress to sleep on at night, regular meals and water. (Decl. Maiorino, Ex.

8   A at OAG-084, OAG-085.) He was seen by medical professionals at least once each day he was

9   in CSW. (Id. at OAG-085, OAG-086.) His medical records show that he complained of

10  swelling and pain to his hands. (Id. at OAG-084, OAG-085.) Plaintiff states that he complained

11  that the restraints and plastic tubes were painful and restricted his blood-flow. (Am. Compl. at ¶

12  46, Exs. I, J at 1-8.)

13     After plaintiff was released from CSW, he was transported to administrative segregation,

14  and sought medical relief. (Id. at ¶ 74.) Plaintiff alleges that although he was given pain

15  medications, Defendant Nurse Steve Nakamura would not also give plaintiff medication because

16  Nakamura did not believe plaintiff was in pain. (Id.) Defendants C. Williams and Anita

17  Waterman examined plaintiff and requested an MRI for him, but the requests were denied twice.

18  (Id. at ¶ 77.) When plaintiff finally received an MRI, it confirmed that plaintiff had extensive

19  damage to his rotator cuff and cartilage. (Id.)

20     On February 10, 2009, plaintiff was again placed back on CSW by defendants

21  McKinney, Bell, Stout, Dickerson. (Id. at ¶ 81.) Defendant Kerr admitted plaintiff at 10:00

22  a.m. (Id. at ¶ 82; Decl. Maiorino, Ex. A at OAG-076.) Plaintiff states that he complained that

23  the restraints and plastic tubes were painful. (Am. Compl. at ¶¶ 83, 84, 87.) The following day,

24  on February 11, 2009, at 6:20 p.m., after plaintiff had had his third bowel movement showing no

25  contraband, plaintiff was released to return to administrative segregation. (Decl. Maiorino, Ex.

26  A at OAG-072.) Over the two days that plaintiff was on CSW, temperature logs show that the

27  temperature averaged 70 degrees. (Decl. Maiorino, Ex. A at OAG-075, OAG-076.) Prison

28  officials observed Plaintiff throughout his CSW placement and checked on him regularly. (Am.

1  Compl., Ex. R.)  He was provided a mattress to sleep on at night, regular meals and water.

2  (Decl. Maiorino, Ex. A at OAG-072, OAG-073, OAG-074, OAG-075, OAG-076.)  He was seen

3  by medical professionals at least once each day he was in CSW.  (Id.)

4      Plaintiff alleges that he continues to suffer from pain and numbness as a result of his

5  placement at CSW.  (Am. Compl. at ¶ 95.)

6                          **DISCUSSION**

7      In his amended complaint, plaintiff claims that: (1) his confinement in the CSW violated

8  the Eighth Amendment, (2) defendants violated the Fourth Amendment when plaintiff was

9  forced to defecate in front of a female prison guard, (3) plaintiff's placement in the CSW

10  violated his right to equal protection, and (4) defendants were deliberately indifferent to his

11  serious medical needs.  Defendants argue that they are entitled to summary judgment.  The court

12  addresses plaintiff's claims in turn.

13  A.    Standard of Review

14      Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

15  that there is "no genuine issue as to any material fact and that the moving party is entitled to

16  judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect

17  the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute

18  as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

19  verdict for the nonmoving party.  Id.

20      The party moving for summary judgment bears the initial burden of identifying those

21  portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

22  issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving

23  party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

24  reasonable trier of fact could find other than for the moving party.  But on an issue for which the

25  opposing party will have the burden of proof at trial, as is the case here, the moving party need

26  only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

27  at 325.

28      Once the moving party meets its initial burden, the nonmoving party must go beyond the

1  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

2  genuine issue for trial." Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over

3  material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

4  Liberty Lobby, Inc., 477 U.S. at 248 (1986).  It is not the task of the court to scour the record in

5  search of a genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).

6  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence

7  that precludes summary judgment.  Id.  If the nonmoving party fails to make this showing, "the

8  moving party is entitled to judgment as a matter of law."  Celotex Corp., 477 U.S. at 323.

9      At the summary judgment stage, the court must view the evidence in the light most

10  favorable to the nonmoving party: if evidence produced by the moving party conflicts with

11  evidence produced by the nonmoving party, the judge must assume the truth of the evidence set

12  forth by the nonmoving party with respect to that fact.  See Leslie v. Grupo ICA, 198 F.3d 1152,

13  1158 (9th Cir. 1999).

14  B.     Plaintiff's claims

15         1.     Cruel and Unusual Punishment

16      Plaintiff claims that his placement and the conditions he endured while in CSW at PBSP

17  violated his Eighth Amendment right to be free from cruel and unusual punishment.  The

18  treatment a prisoner receives in prison and the conditions under which he is confined are subject

19  to scrutiny under the Eighth Amendment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993).

20  The Amendment also imposes duties on these officials, who must provide all prisoners with the

21  basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal

22  safety.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  A prison official violates the Eighth

23  Amendment when two requirements are met: (1) the deprivation alleged must be, objectively,

24  sufficiently serious, id. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)), and (2) the

25  prison official possesses a sufficiently culpable state of mind, Farmer, 511 U.S. at 834 (citing

26  Wilson, 501 U.S. at 297).

27      Even viewing the evidence in a light most favorable to plaintiff, it does not establish that

28  defendants acted with a sufficiently culpable state of mind.  The requisite state of mind to

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Uvalles221msj.wpd     7

1    establish an Eighth Amendment violation depends on the nature of the claim.  In prison-

2    conditions cases, the necessary state of mind is one of "deliberate indifference."  See, e.g.,

3    Farmer, 511 U.S. at 834 (inmate safety); Wilson, 501 U.S. at 302-03 (general conditions of

4    confinement); Estelle v. Gamble, 429 U.S. 97, 104 (1976) (inmate health).  But where a prisoner

5    claims that prison officials used excessive force, he must show that the officials applied force

6    maliciously and sadistically to cause harm.  See Hudson, 503 U.S. at 6-7.  The "malicious and

7    sadistic" standard also applies where, as here, a prisoner challenges measured practices and

8    sanctions used in exigent circumstances or imposed with considerable due process to maintain

9    control over difficult prisoners.  See LeMaire v. Maass, 12 F.3d 1444, 1452-54 (9th Cir. 1993)

10   (citing Whitley v. Albers, 475 U.S. 312, 320-22 (1986) (finding proper the heightened standard

11   to give deference to "a prison security measure taken in response to an actual confrontation with

12   riotous inmates, [as well as] to prophylactic or preventive measures intended to reduce the

13   incidence of these or any other breaches of prison discipline"), and Hudson v. McMillian, 503

14   U.S. 1, 6-7 (1992)); accord Perez v. Cate, No. 10-3730 JSW (N.D. Cal. Feb. 25, 2013); Meraz v.

15   Repond, 2009 WL 723841 (N.D. Cal. Mar. 18, 2009) (Patel, J.).  Under this standard, plaintiff

16   must show that the defendants acted maliciously and sadistically to cause harm.  See id.

17       Defendants proffer evidence that in September 2008, the Northern Structure prison gang

18   stabbed a correctional officer in the face in an attempt to kill him.  (Decl. Barneburg at ¶ 9.)  On

19   October 18, 2008, a validated Northern Structure prison gang member defecated a kite

20   containing names of other inmates at PBSP, including plaintiff's.  (Id.)  Through their knowledge

21   of common means of communication between Northern Structure gang members, the recent

22   attack on the correctional officer, and the information on the kite naming individuals – including

23   plaintiff – who were willing to take orders on behalf of the Northern Structure, prison officials

24   suspected that plaintiff potentially was concealing weapons or contraband in his rectum and

25   ordered him placed on CSW.  (Id.)  These circumstances indicate that plaintiff was placed on

26   CSW because prison officials had reasonable grounds for suspecting that he had ingested

27   contraband, and not because they maliciously and sadistically wished to cause him harm.

28       Moreover, the circumstances of the CSW were designed to reveal whether plaintiff had

1   ingested contraband in his body and to prevent him from concealing, destroying or re-ingesting

2   the contraband.  The evidence that the tube devices greatly increased the effectiveness of

3   contraband interception further suggests that officials used them in order to intercept contraband,

4   rather than to hurt plaintiff.  While the conditions of CSW were onerous, there is no evidence

5   that they were imposed maliciously and sadistically to cause plaintiff harm.  Accord Perez v.

6   Cate, No. 10-3730 JSW (N.D. Cal. Feb. 25, 2013) (more than three days on CSW did not

7   establish malicious or sadistic purpose); Meraz v. Repond, 2009 WL 723841 (N.D. Cal. Mar. 18,

8   2009) (Patel, J.) (three days on CSW did not establish defendants' malicious or sadistic purpose

9   to cause inmate harm).

10        Further, plaintiff alleged that, on October 27, 2008, he was cold, began using his legs to

11   try to warm up his hands, and curled up his body.  (Am. Compl. at ¶ 59.)  Defendant John Doe

12   asked defendant Gonzales if he smelled something because Doe thought he smelled feces.  (Id. at

13   ¶ 62.)  Gonzales looked at plaintiff and asked what he was doing.  (Id.)  Both Doe and Gonzales

14   opened the cell door, grabbed plaintiff, stripped him naked, and inspected plaintiff's clothes and

15   the tube for contraband.  (Id. at ¶¶ 62A-65.)  Even viewing the facts in the light most favorable to

16   plaintiff, the evidence demonstrates that defendants here applied force in a good-faith effort to

17   maintain or restore discipline rather than for a malicious or sadistic purpose.  Plaintiff does not

18   provide evidence demonstrating otherwise.

19        Moreover, the conditions plaintiff experienced on CSW were not sufficiently serious to

20   violate the Eighth Amendment.  Prison conditions are sufficiently serious to violate the Eighth

21   Amendment where the inmate is denied the basic necessities of life such as food, clothing,

22   shelter, sanitation, medical care and personal safety.  See Farmer, 511 U.S. at 832.  In

23   determining whether a deprivation of a basic necessity is sufficiently serious to violate the

24   Eighth Amendment, a court must consider "the circumstances, nature, and duration of the

25   deprivation."  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).  During his placement on

26   CSW, plaintiff was provided all of the basic necessities of life, including shelter, food, drinking

27   water, clothing, personal safety and medical attention.  While placement in the CSW was

28   difficult and at times painful, as plaintiff asserts, it lasted a relatively limited period of time.

1   Absent evidence of some deprivation of a basic life necessity over that time, or that the

2   conditions lasted longer, the conditions do not rise to the level of an Eighth Amendment

3   violation.  See, e.g., Anderson v. County of Kern, 45 F.3d 1310, 1314-15 (9th Cir.), amended, 75

4   F.3d 448 (1995) (temporary placement in safety cell that was dirty and smelled bad did not

5   constitute infliction of pain); Harris v. Fleming, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (five

6   days in a "filthy, roach-infested cell" did not violate the Eighth Amendment); Holloway v.

7   Gunnell, 685 F.2d 150 (5th Cir. 1985) (no claim stated where prisoner forced to spend two days

8   in hot dirty cell with no water); Miles v. Konvalenka, 791 F. Supp. 212 (N.D. Ill. 1992) (single

9   instance of finding mouse in food not actionable); Evans v. Fogg, 466 F. Supp. 949 (S.D.N.Y.

10  1979) (no claim stated by prisoner confined for 24 hours in refuse strewn cell and for two days in

11  flooded cell). Cf. Hearns v. Terhune, 413 F.3d 1036, 1041-42 (9th Cir. 2005) (allegations of

12  serious health hazards in disciplinary segregation yard for a period of nine months, including

13  toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects,

14  and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees,

15  enough to state a claim of unconstitutional prison conditions).

16       The evidence presented, even when viewed in a light most favorable to plaintiff, does not

17  establish that defendants acted maliciously and sadistically to harm plaintiff or that the

18  conditions of CSW were sufficiently serious to violate the Eighth Amendment.  Consequently,

19  defendants are entitled to summary judgment on this claim.[4]

20  _____

21       [4] Defendants C. Grieco, R. Drown, D. Schracker, and Speaker were never served with
    process.  Nonetheless, judgment will be entered in favor of these defendants, as well as those
22  who moved for summary judgment because the same facts support judgment for all of them, and
    plaintiff had a "full and fair opportunity to brief and present evidence" on the dispositive issues.
23  See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 803 (9th Cir. 1995).
    Specifically, C. Grieco was in an identical position to prison guard defendants whom plaintiff
24  alleges "did nothing" to alleviate the pain in plaintiff's hands in CSW on October 24, 2008.
    (Am. Compl. at ¶ 37.)  Plaintiff's claim against R. Drown is merely that he was a member of the
25  Investigative Services Unit who ordered plaintiff into CSW.  (Am. Compl. at ¶ 6.)  Finally,
    plaintiff alleges that D. Schracker was a correctional officer, somehow affiliated with PBSP, and
26  Speaker was a correctional officer involved with plaintiff's second placement at CSW.  Plaintiff
    has failed to allege facts that defendants R. Drown, D. Schracker, or Speaker were "personally
27  involved" in any deprivation of his civil rights, and thus, they are entitled to summary judgment
    as well.  See Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998).
28

1   Alternatively, defendants are also entitled to qualified immunity.  The defense of

2   qualified immunity protects "government officials . . . from liability for civil damages insofar as

3   their conduct does not violate clearly established statutory or constitutional rights of which a

4   reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  A

5   court considering a claim of qualified immunity must determine whether the plaintiff has alleged

6   the deprivation of an actual constitutional right and whether such right was clearly established

7   such that it would be clear to a reasonable officer that his conduct was unlawful in the situation

8   he confronted.  See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).  The plaintiff bears the

9   burden of proving the existence of a "clearly established" right at the time of the allegedly

10  impermissible conduct Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).  If

11  the law is determined to be clearly established, the next question is whether, under that law, a

12  reasonable official could have believed his conduct was lawful.  Act Up!/Portland v. Bagley, 988

13  F.2d 868, 871-72 (9th Cir. 1993).

14  The court may grant qualified immunity by viewing all of the facts most favorably to

15  plaintiff and then finding that under those facts the defendants could reasonably believe they

16  were not violating the law.  See, e.g., Marquez v. Gutierrez, 322 F.3d 689, 692-93 (9th Cir.

17  2003).  Whether a reasonable official could have believed the action taken was lawful is a mixed

18  question of law and fact: "It involves an objective test of whether a reasonable official could

19  have believed that his conduct was lawful in light of what he knew and the action he took."

20  Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995).

21  The Ninth Circuit recently found that defendants were entitled to qualified immunity on

22  an Eighth Amendment claim brought by an inmate who was placed on CSW for seven days.

23  Chappell v. Mandeville, 706 F.3d 1052 (9th Cir. 2013).  In Chappell, the inmate was subject to

24  temporary confinement where he was closely monitored and his bowel movements searched to

25  determine whether he had ingested contraband.  Id. at 1055.  He was permitted two pairs of

26  underwear, taped at the waist and thighs, placed in two jumpsuits taped at the thighs, ankles,

27  waist, and upper arms so as to close off any openings in his clothing.  Id.  The inmate was also

28  placed in waist chain restraints, ankle shackles, and chained to the bed.  Id. at 1055-56.  The

1  lights were kept on the cell to allow for surveillance, and the cell had no furniture other than a

2  bed without a mattress.  Id. at 1055.  When the inmate needed to defecate, he notified prison staff,

3  who brought him a plastic, moveable chair.  Id.  The Ninth Circuit noted that, by April and May

4  2002, there were no cases in this jurisdiction or others that involved a contraband watch similar

5  to the one described.  Id. at 1061.  This court has also not discovered any CSW cases that would

6  have provided further clarity to a reasonable officer in October 2008 or February 2009 – the time

7  plaintiff was placed in CSW.

8       Here, the focus of the court's inquiry is whether defendants had fair notice that their

9  actions were unconstitutional.  Here, defendants provided evidence that the conditions in the

10  CSW were necessary for the penological purpose of prison security and safety.  Namely, they

11  had a reasonable suspicion that plaintiff was harboring contraband in his rectum.  Given this

12  important penological purpose and the state of the law at the time, the conditions surrounding

13  that contraband watch were not "such a far cry from what any reasonable prison official could

14  have believed was legal that the defendants knew or should have known they were breaking the

15  law."  Chappell, 706 F.3d at 1062.  Defendants are entitled to qualified immunity on this claim.

16       2.       Fourth Amendment

17       Plaintiff claims that defendants violated his right to bodily privacy.  (Am. Compl. at

18  ¶ 101.)  Specifically, plaintiff alleges that he felt exposed and embarrassed when he was forced

19  to perform bodily functions, such as defecate and urinate, in front of Sergeant Henderson, a

20  female.  (Id. at ¶¶ 19-25, 101.)

21       The Fourth Amendment applies to the invasion of bodily privacy in prisons.  Bull v. San

22  Francisco, 595 F.3d 964, 974-75 (9th Cir. 2010) (en banc); Michenfelder v. Sumner, 860 F.2d

23  328, 333 (9th Cir. 1988).  To analyze a claim alleging a violation of this privacy right, the court

24  must apply the test set forth in Turner v. Safley, 482 U.S. 78, 89 (1987), and determine whether a

25  particular invasion of bodily privacy was reasonably related to legitimate penological interests.

26  See Bull, 595 F.3d at 973; Michenfelder, 860 F.2d at 333-34.

27       Although a cross-gender strip search that involves touching the inmate's genitalia and

28  searching inside his anus is unreasonable, Byrd v. Maricopa Cnty. Sheriff's Dep't, 629 F.3d

1   1135, 1142 (9th Cir. 2011) (en banc), that does not mean that all cross-gender searches are

2   unreasonable, or that prisoners of one gender may not be guarded by guards of the other gender.

3   In Grummett v. Rushen, 779 F.2d 491, 494 (9th Cir. 1985), the Ninth Circuit upheld a system of

4   assigning female officers within a correctional facility such that they occasionally viewed male

5   inmates in various states of undress and conducted routine pat-downs of fully clothed inmates.

6   See Byrd, 629 F.3d at 1142. Assigned positions of female guards that required only infrequent

7   and casual observation, or observation at a distance, of unclothed male prisoners and that are

8   reasonably related to prison needs are not so degrading as to warrant court interference. See

9   Michenfelder, 860 F.2d at 334; see also Jordan v. Gardner, 986 F.2d 1521, 1524-25 (9th Cir.

10  1993) (en banc) (privacy interest in freedom from cross-gender clothed body searches not

11  "judicially recognized"). The issue is whether officers regularly or frequently observe unclothed

12  inmates of the opposite sex without a legitimate reason for doing so. See Michenfelder, 860 F.2d

13  at 334.

14          Here, even viewing the facts in the light most favorable to plaintiff, there is no evidence

15  that Sergeant Henderson's interaction with plaintiff when he was attempting to defecate was

16  anything more than infrequent or casual, or from a distance. The scope and manner of Sergeant

17  Henderson's "search" was visual only and did not involve any touching. See Michenfelder, 860

18  F.2d at 332 ("[v]isual body cavity searches conducted after contact visits as a means of

19  preventing prisoners' possession of weapons and contraband, even absent probable cause, have

20  been found reasonable by the Supreme Court."). Moreover, because plaintiff was on CSW, was

21  under constant observation for potential contraband, and had to defecate during Sergeant

22  Henderson's watch, her position of observation was reasonably related to the penological goal of

23  prison safety. See Michenfelder, 860 F.2d at 334; Grummett, 779 F.2d at 494-95.

24          Accordingly, defendants are entitled to summary judgment on this claim.

25          Alternatively, even assuming that Byrd would be relevant to plaintiff's claim, Byrd was

26  decided in 2011 – years after plaintiff's placement in the CSW. Thus, Byrd does not control this

27  analysis. At the time of the events at issue here, the law had "never held that a prison guard of

28  the opposite sex [could not] conduct routine visual body cavity searches of prison inmates."

1   Somers v. Thurman, 109 F.3d 614, 620 (9th Cir. 1997).  Further, in 2008, it was understood that

2   while inmates "may have protected privacy interest in freedom from cross-gender body searches,

3   such interests have not yet been judicial recognized."  Jordan v. Gardner, 986 F.2d 1521, 1525

4   (9th Cir. 1993) (en banc).  Accordingly, at the time these events took place, the law was not

5   clearly established that allowing a female officer to observe a male inmate defecate was

6   unlawful.  That is, a reasonable official could have believed that allowing a female officer to

7   observe plaintiff in that manner was not unlawful.  Accordingly, defendants are entitled to

8   qualified immunity.

9          3.      Equal Protection Clause

10          Plaintiff claims that defendants violated the Equal Protection Clause by discriminating

11   against him and other Northern Hispanics.  Specifically, plaintiff alleges that only Northern

12   Hispanics were placed on CSW for several days without any cause.

13          "The Equal Protection Clause of the Fourteenth Amendment commands that no State

14   shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

15   essentially a direction that all persons similarly situated should be treated alike."  City of

16   Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S.

17   202, 216 (1982)).  A claim of racial discrimination under the Equal Protection Clause requires

18   demonstration of discriminatory intent.  Washington v. Davis, 426 U.S. 229, 239-40 (1976);

19   Barren v. Harrington, 152 F.3d 1193, 1194-95 (9th Cir. 1998).

20          Defendants proffer that plaintiff was placed in the CSW because the Northern Structure

21   prison gang launched an attempted murder on one of the prison guards.  While the Northern

22   Structure is not in and of itself a "racial classification," its membership is likely based to some

23   extent on racial classification.  However, even assuming that plaintiff's placement into CSW

24   was, in part, based on a racial classification, the procedures were narrowly tailored to address a

25   compelling government interest, i.e., prison security.  See Johnson v. California, 543 U.S. 499,

26   511-13, 515 (2005).  The evidence provided by defendants regarding placement policies into the

27   CSW, and circumstances surrounding plaintiff's placement into the CSW, demonstrate that

28   defendants did not have some invidious or discriminatory purpose against him.  Further, outside

1   of plaintiff's conclusory beliefs, he fails to provide any competent evidence that other similarly-

2   situated inmates were being treated differently, and that his placement in the CSW was based on

3   his race rather than on his perceived membership in the Northern Structure prison gang.  Thus,

4   there is no genuine issue of material fact on plaintiff's equal protection claim, and defendants are

5   entitled to summary judgment.

6           4.    Medical needs

7           Plaintiff claims that defendants were deliberately indifferent to his serious medical needs

8   by failing to properly treat his injuries of a torn shoulder, nerve damage and pain, numbness in

9   his hands, back pain, and "other injuries."  (Am. Compl. at ¶ 111.)  Plaintiff alleges that the tube

10  device caused his hands to swell and restricted blood flow to his hands, and it took several

11  months for the doctors to order an MRI.  Plaintiff argues that, as a result, he had to have rotator

12  cuff surgery and his hands still have pain and numbness.  (Id. at ¶ 112.)

13          A determination of "deliberate indifference to serious medical needs" involves an

14  examination of two elements: the seriousness of the prisoner's medical need and the nature of the

15  defendants' response to that need.  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992),

16  overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.

17  1997) (en banc).  A prison official is deliberately indifferent if he knows that a prisoner faces a

18  substantial risk of serious harm and disregards that risk by failing to take reasonable steps to

19  abate it.  Farmer, 511 U.S. at 837.  The prison official must not only "be aware of facts from

20  which the inference could be drawn that a substantial risk of serious harm exists," but he "must

21  also draw the inference."  Id.  If a prison official should have been aware of the risk, but was not,

22  then the official has not violated the Eighth Amendment, no matter how severe the risk.  Gibson

23  v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002).

24          Here, the undisputed evidence shows that prison officials did not demonstrate deliberate

25  indifference to plaintiff's medical needs.  Plaintiff was medically cleared to enter CSW on

26  October 23, 2008.  (Am. Compl., Ex. D at 2; Decl. Maiorino, Ex. A at OAG-084.)  The

27  following day, after complaining that the tubes were too tight, his cuffs were adjusted.  (Id. at ¶

28  38.)  Plaintiff again was medically cleared to continue in the CSW.  (Id., Ex. O at 4.)  The next

day, October 25, 2008, plaintiff again complained that he felt pain in his hands, and again, the tubes were adjusted.  (Id. at ¶¶ 44, 47, Ex. O at 6.)  On October 26, 2008, plaintiff again complained of pain in his hands, and the tubes were checked for a proper fit, and a nurse placed gauze around his wrists and he was prescribed anti-inflammatories.  (Id. at ¶¶ 50, 51, Ex. H at 5.) At that time, plaintiff denied feeling any numbness or tingling.  (Id., Ex. J at 2.)  Plaintiff was also instructed to keep his hands elevated as much as possible until he was released from CSW, and to notify medical if he felt numbness, tingling, or an increase in pain.  (Id., Ex. J. at 3.)  His hands were checked again that day, and the excess gauze removed.  (Id. at ¶ 58.)  On October 27, 2008, Nurse Gavin was instructed to massage plaintiff's hands every 15 minutes to improve circulation.    (Id. at ¶¶ 68-69.)  After plaintiff was released, he was seen by Nurse Williams, who reported that plaintiff's hands were swollen and slightly purple, but he had full sensation, was able to move all his fingers with fair range of motion, and had good radial pulses.  (Id., Ex. I at 2.)  The following day, Nurse Williams reported that plaintiff stated his hands were still sore but felt much better.  (Id., Ex. J at 5.)  Nurse Williams noted that the swelling had decreased and plaintiff reported full sensation in his hands.  (Id.)

Similarly, on February 10, 2009, plaintiff was placed on CSW again at 10:00 a.m.  (Id. at ¶¶ 81, 82.)  Prior to being placed, plaintiff was medically cleared, and complained that he had a bad back and his right arm and shoulder were "messed up from last time."  (Id., Ex. S at 6, 9.) Plaintiff complained to Branion, Kerr, John Doe, and Traylor that the pain in his back and hands were getting worse, but no one did anything.  (Id. at ¶ 83.)  At 10:00 p.m. and 11:00 p.m., plaintiff's restraints were secured and checked.  (Decl. Maiorino, Ex. A at OAG-075.)  At 3:30 a.m. on February 11, 2009, plaintiff's cuffs were adjusted.  (Am. Compl. at ¶ 84; Decl. Maiorino, Ex. A at OAG-074.)  At 3:45 a.m., plaintiff saw the clinic nurse and at 4:15 a.m., when he was returned to the CSW cell, plaintiff did not have to put the tubes back on.  (Decl. Maiorino, Ex. A at OAG-074.)  Plaintiff was seen by Nurse Dungan, who noted that plaintiff's hands were inflamed, but plaintiff's cuffs had been loosened, and he had a good range of motion in both wrists.  (Am. Compl., Ex. P at 2.)  Nurse Dungan also gave him Tylenol #3.  (Id.)  Plaintiff was given ice packs for his hands.  (Decl. Maiorino, Ex. A at OAG-074., Am. Compl. at ¶ 86.)  Later

1  in the morning, plaintiff was placed back in "the tube" even though his hands were still swollen.

2  (Id. at ¶ 87.)  When plaintiff asked why his hands were numb, Dr. Capitano responded that

3  plaintiff had nerve damage on the tops of his hands, and it should get better within 6 months.

4  (Id. at ¶ 89.)  The doctor's notes, however, note that plaintiff had reported that the swelling had

5  gone down from the day before, and although the top of his left hand was numb, his hands were

6  not painful.  (Id., Ex. Q at 2.)  From October 26, 2008 through February 17, 2009, plaintiff

7  received medical care regarding his hands and wrists thirteen times.  (Decl. Sayre at ¶ 9.)

8         Negligence cannot establish liability under the Eighth Amendment.  See Farmer, 511

9  U.S. at 835-36 & n.4.  An "official's failure to alleviate a significant risk that he should have

10  perceived but did not, . . . cannot under our cases be condemned as the infliction of punishment."

11  Id. at 838.  In order for deliberate indifference to be established, there must be a purposeful act

12  or failure to act on the part of the defendant, as well as resulting harm.  McGuckin, 974 F.2d at

13  1060.  Here, there is no evidence that defendants knew that plaintiff faced a substantial risk of

14  serious harm by keeping plaintiff's hands restrained by the tubes, yet disregarded that risk by

15  failing to take reasonable steps to abate it.  See Farmer, 511 U.S. at 837.  Moreover, the

16  undisputed evidence shows that defendants took reasonable steps to abate plaintiff's complaints.

17  Even assuming plaintiff's version of the facts is true, he has not provided evidence

18  demonstrating that defendants were deliberately indifferent to his serious medical needs.

19  Further, plaintiff has failed to show that the defendants' actions were medically unacceptable

20  under the circumstances, or that they chose this course in conscious disregard of an excessive

21  risk to his health.  See Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

22         With respect to defendant Nakamura, plaintiff merely alleges that although he was given

23  pain medications after he was released from CSW in October 2008, Nurse Nakamura would not

24  give plaintiff additional medication because Nurse Nakamura did not believe plaintiff was in

25  pain.  (Am. Compl. at ¶ 74.)  Plaintiff's medical records show that Nurse Nakamura examined

26  plaintiff on November 11, 2008, and noted that he was in no obvious pain or distress, and there

27  was no obvious swelling to plaintiff's right hand.  (Id., Ex. J at 9.)  On March 2, 2009, Nurse

28  Nakamura examined plaintiff and scheduled a follow-up appointment for plaintiff.  (Id., Ex. J at

12.)  Plaintiff in fact was seen the following day by Dr. Waterman.  (Id., Ex. J at 18.)  There is an

absence of evidence that plaintiff asked for and Nurse Nakamura denied plaintiff's request for

pain medication.  Even if Nurse Nakamura denied a request for pain medication, plaintiff has not

shown that Nurse Nakamura's actions were medically unacceptable under the circumstances, or

that he chose this course in conscious disregard of an excessive risk to plaintiff's health.  See

Toguchi, 391 F.3d at 1058.  Further, plaintiff has not shown that Nurse Nakamura knew that

plaintiff faced a substantial risk of serious harm if he did not receive additional pain medication,

yet disregarded that risk by failing to prescribe it.  See Farmer, 511 U.S. at 837.

Regarding plaintiff's medical care after he was released from CSW in February 2009,

plaintiff claims that he sought medical help for his shoulder pain, hand pain and numbness, and

aggravated back pain for the past year as a result of his time in CSW.  (Id. at ¶ 93.)  Specifically,

plaintiff argues that defendant Doctors Williams and Waterman recommended MRIs for

plaintiff, but defendant Doctor Sayre denied the recommendations.  (Am. Compl. at ¶ 93.)  The

undisputed evidence shows that, on June 8, 2009, an MRI of plaintiff's shoulder was denied.

(Decl. Sayre at ¶ 8.)  Because an MRI is requested prior to surgery, and attempts at less-invasive

methods are "medically prudent" before treating with surgery, Doctor Sayre believed ordering an

MRI was premature.  (Id.)  On August 3, 2009, plaintiff's treating physician again recommended

an MRI, and the medical review committee denied the request as premature because plaintiff had

not yet received alternative medical treatments.  (Id.)  Finally, on September 1, 2009, the

committee approved an MRI.  (Id.)  Plaintiff has not provided evidence that this course of

treatment was medically unacceptable or that his condition was in any way worsened as a result

of opting for conservative treatment before an MRI or surgery.  Thus, there is an absence of

evidence to support a finding that the delay in receiving an MRI was the result of deliberate

indifference to his condition.

Accordingly, defendants are entitled to summary judgment on this claim.[5]

---

[5] Defendant Dr. Capitano was not served with process in this action.  Nonetheless,
judgment will be entered in favor of her, as well as those who moved for summary judgment
because the same facts support judgment for all of them, and plaintiff had a "full and fair

**C.** Miscellaneous defendants

To the extent plaintiff attempts to raise a claim against defendants for denying his administrative appeals, such a claim is dismissed for failure to state a claim. There is no constitutional right to a prison administrative appeal or grievance system, and thus, plaintiff fails to state a claim. See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003).

Moreover, to the extent plaintiff sues defendants in their supervisory roles, plaintiff was required to show that the supervisor was (1) personally involved in the constitutional deprivation, or (2) had a sufficient causal connection between his or her wrongful conduct and the constitutional violation. Henry A. v. Willden, 678 F.3d 991, 1003-04 (9th Cir. 2012) (citing Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011)). Here, however, because the court has found no injury or constitutional violation, no supervisor can be held liable. See Jackson v. City of Bremerton, 268 F.3d 646, 653-54 (9th Cir. 2001). Thus, the supervisory defendants are entitled to summary judgment.[6]

---

opportunity to brief and present evidence" on the dispositive issues. See Columbia Steel Fabricators, Inc., 44 F.3d at 803. Here, Dr. Capitano saw plaintiff on February 11, 2009 while he was still in CSW, and had difficulty finding plaintiff's pulse. (Am. Compl. at ¶ 89.) She told plaintiff that his hands would feel better in about six months, and recommended that he "quit going to CSW." (Id.) These statements do not show that Dr. Capitano was personally involved in the deprivation of plaintiff's civil rights. Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998). Thus, Dr. Capitano is entitled to summary judgment.

[6] Defendants C. Parry, P.T. Smith, were never served with process. Nonetheless, judgment will be entered in favor of these defendants, as well as those who moved for summary judgment because the same facts support judgment for all of them, and plaintiff had a "full and fair opportunity to brief and present evidence" on the dispositive issues. See Columbia Steel Fabricators, Inc., 44 F.3d at 803. Further, plaintiff fails to state a claim against P.T. Smith because plaintiff alleged that P.T. Smith failed to properly respond to an administrative appeal. (Am. Compl. at ¶ 4.) In addition, plaintiff alleged that P.T. Smith and C. Parry "approved" the order to place plaintiff in CSW. (Id. at ¶¶ 8-9.) However, as with the other supervisory defendants, plaintiff has failed to demonstrate that P.T. Smith or C. Parry are liable as supervisors, or that they were personally involved in any wrongdoing.

1

**CONCLUSION**

2      Defendants' motion for summary judgment is GRANTED.  Judgment shall be entered in

3  favor of defendants.  The clerk shall terminate all pending motions and close the file.

4      IT IS SO ORDERED.

5  DATED:  _____

RONALD M. WHYTE
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.Rmw\CR.09\Uvalles221msj.wpd     20

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

RAUL UVALLES,

                  Plaintiff,

  v.

FRANCISCO JAQUEZ et al,

                  Defendant.
_____/

Case Number: CV09-05221 RMW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 27, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Raul Uvalles T-59954
Pelican Bay State Prison
Housing: C9-116
P.O. Box 7500
Crescent City, CA 95532

Dated: March 27, 2013

                                      Richard W. Wieking, Clerk
                                      By: Jackie Lynn Garcia, Deputy Clerk